# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|                                                       |     |                          |
| ----------------------------------------------------- | --- | ------------------------ |
| JANICE ANN SMITH,                                     | )   |                          |
|                                                       | )   |                          |
| *Plaintiff,*                                          | )   |                          |
|                                                       | )   | Case No.  16 C 5451      |
| v.                                                    | )   |                          |
|                                                       | )   | Judge Virginia M. Kendall |
| NANCY A. BERRYHILL, Acting Commis-                    | )   |                          |
| sioner of Social Security.*                           | )   |                          |
|                                                       | )   |                          |
| *Defendant.*                                          | )   |                          |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Janice Ann Smith seeks judicial review of an Administrative Law Judge's ("ALJ") decision to deny her disability insurance benefits under the Social Security Act.  (Dkt. 1.)  The plaintiff argues that the ALJ erred in determining the plaintiff's: (1) residual functional capacity ("RFC"); (2) credibility; and (3) ability to perform the requirements of any work other than her past relevant work ("Step Five").  (Dkt. 15.)  The Acting Commissioner disagrees with Smith on all fronts and asks this Court to affirm.  (Dkt. 23.)  Both parties now move for summary judgment. (Dkt. 14; 22.)  Because substantial evidence does not support the ALJ's decision, the Court grants Smith's motion, denies the acting Commissioner's motion, vacates the Acting Commissioner's judgment, and remands the case to the Social Security Administration ("SSA") for further proceedings consistent with this opinion.

---

* Because Nancy A. Berryhill is now the Acting Commissioner of Social Security, she automatically substitutes in for Carolyn W. Colvin as the defendant. Fed. R. Civ. P. 35(d).

## BACKGROUND

Janice Smith principally suffers from bilateral benign essential blepharo-spasm, a "neurologic disorder characterized by excessive blinking and forced involuntary closure of the eyelids." (R. 606.) She also has dry eye syndrome. (R. 606.) Both are "chronic conditions which may worsen with the passage of time." (R. 606.) Primarily because of her debilitated vision, Smith applied for disability benefits with the Social Security Administration in 2010. (R. 117–123.)

## I. Facts

Smith is a 67-year-old woman. (R. 117.) She stands 5'3" tall and weighs approximately 120 pounds. (R. 142.) She lives with her husband, Michael Smith. (R. 424). From 1997 until 2001, Smith managed an office for a plumbing and heating firm. (R. 456.) Following that, she was a receptionist and backup teller at a bank until 2008. (R. 456.) That year, her employer laid her and two of her coworkers off because of the impending economic recession. (R. 423.)

After being let go, Smith did not immediately search for another job because she stayed home to care for her aging mother who was ill at the time. (R. 423.) The mother stayed with the Smiths for a year before moving to assisted living. (R. 423–24.) Over the course of the few years that followed, Smith and her husband both fell ill. Michael Smith suffered a stroke and still experiences problems with his back. (R. 424.) Today, the spouses help each other out when they can, but often, their siblings or neighbors assist them. (R. 424.)

## A.     Blepharospasm and Dry Eye

Smith began experiencing the symptoms of her eye conditions in 2010.  (R. 606.)  Her eyes uncontrollably blink and spasm. (R. 423.)  These symptoms, however, cannot just be chalked up to ordinary blinking.  Indeed, her eyelids flutter and spasm until, sometimes, they close.  (R. 426.)  During these periods of blinking and spasm, Smith loses most, if not all, of her vision.  (R. 426.)

Smith receives treatment from Dr. Jeffrey R. Haag, a neuro-ophthalmologist at Wheaton Eye Clinic. (R. 606.)  Dr. Haag believes that blepharospasm "significantly impairs Mrs. Smith's activities of daily living." (R. 606.)  To help relieve her pain and sustain her vision, Dr. Haag injects Smith with Botox approximately every two to three months. (R. 606.)  The Botox freezes the nerve that goes to the muscle which makes her blink.  (R. 430.)  "This treatment lessens her symptoms, but it does not completely alleviate them." (R. 606.)  The blepharospasm prevents her eyes from ever completely closing.  (R. 430.)

The injections sometimes can take quite a while to kick in.  (R. 424.)  Often, if not always, the injections do not last the full three months.  (R. 424).  For the first ten days to two weeks following the treatment, Smith cannot see well enough to drive. (R. 425.)  Approximately three weeks after each injection period, the spasms restart. (R. 425–26.)  These episodes cause blurry vision and great discomfort.  (R. 441, 445.)  On a scale from one to ten, the pain is a ten for Smith.  (R. 441.)  It interferes with her daily life and leaves her constantly fatigued.  (R. 451.)  That said, but for the Botox, Smith would not be able to see at all.  (R. 445.)

Smith's eyes always burn (R. 439) and the burning precludes concentration. (R. 451.) So, Smith regularly uses eye drops to alleviate her pain. (R. 448.) She takes five minutes to administer the eye drops every twenty minutes or so throughout each day. (R. 448.) The drops temporarily blur her vision. (R. 448.) Sometimes, the burning gets so bad for Smith that she uses a gel instead of the drops. (R. 426.) She started using the gel back in 2010 when the condition began. (R. 437.) The gel effectively seals her eyes shut. (R. 426.) After applying this gel, Smith can barely see: it is like looking through "Jell-O" or a "rainy window." (R. 427.) Even talking to people is tough for Smith (R. 425) because she cannot see clearly when the gel is in her eyes. (R. 427).

Usually, Smith applies this gel to her eyes twice a week. (R. 450.) But during the first two weeks and last three weeks of her injection period, Smith uses it three or four times every day. (R. 427.) The effects last for an hour at a time. (R. 427, 451.) Usually, Smith applies the gel at 10 p.m., then reapplies it again at 2 a.m., and again at 5 a.m. throughout the night. (R. 431.) Whenever the gel is in, Smith cannot see obstructions in front of her. (R. 433.) Even though she cannot see, the gel provides her much relief, so she uses it during the day also. (R. 433–34.) However, if she wants to get back to doing something, she needs to wash her face first to see. (R. 451.)

## B.    Other Physical and Mental Impairments

Blepharospasm and dry eye syndrome are not the only conditions to plague Smith. She also suffers from a handful of other ailments. First, she has cataracts, which means she will occasionally see "floaters" (black blobs in the line of sight). (R.

435.) The cataracts, however, do not impact Smith that much. (R. 436.) Second, Smith experiences spondylosis which causes back and hip pain. (R. 442, 444.) About once a month a spasm hits her, lasting three to four days and relegating her to bed rest with a heating pad. (R. 453.) Third, she has asthma and requires her inhaler every couple of weeks. (R. 443, 453–54.) Fourth, Smith experiences depression, although she takes Diazepam which helps alleviate the symptoms. (R. 443.) Fifth, she complains of tennis elbow and hand pain, which she characterizes as carpal tunnel syndrome. (R. 443.) Sixth, although not discussed at the hearing, but apparent on the face of the written record, Smith has irritable bowel syndrome ("IBS") and gastroesophageal reflux disease ("GERD" or acid reflux). (R. 615, 617, 662, 665, 667–68).

## C. Daily Life

Smith cannot drive a car for five weeks out of every twelve because of her Botox treatment. (R. 435.) Even during the other seven weeks, Smith tries not to drive and usually can only make it a few blocks. (R. 435.) Often, she turns around because her vision is so bad. (R. 435.) Most of the time, Smith cannot see well enough to read. (R. 438.) She needs a ruler to guide her eyes along the page. (R. 438) For example, Smith can read the newspaper, but not the telephone book, because the font is too small. (R. 439.) She occasionally uses a computer to pay bills but cannot stare at the screen for more than 10 minutes before needing to take a break. (R. 439, 454.) Sometimes Smith cannot even watch TV. (R. 436.)

Smith does not regularly exercise or walk. (R. 454.) She can walk up to three blocks but no more. (R. 444.) Even stepping down stairs is a difficult task for Smith

because she fears falling. (R. 440.) Instead, uses a chairlift to climb or descend stairs. (R. 440.) She can generally lift and carry objects up to 10 pounds. (R. 443, 453.) She can sit for about two hours and stand for approximately a half an hour at a time. (R. 444). Smith regularly needs help with errands. (R. 436.) She does her best to complete chores but rarely can do so without taking breaks. (R. 452.) Sometimes she cannot cook by herself. (R. 436.) In sum, Smith cannot function for five weeks out of every twelve. (R. 446.) And these challenges leave her with no motivation to do anything. (R. 452.)

## II. Procedural History

On December 30, 2010 Smith applied for disability benefits under Title II of the Social Security Act. (R. 117–123.) The SSA denied her application on March 10, 2011. (R. 52.) Smith requested reconsideration, but the SSA denied that, too. (R. 53.) An ALJ heard the case on July 17, 2012 (R. 19–51) and entered an unfavorable decision on August 9. (R. 6–18). The Appeals Council declined Smith's request to review that decision. (R. 1–4, 469–472.)

So, on January 13, 2014, Smith sued the SSA in federal court. The government, however, agreed with her to remand the case (R. 493–94,) and that is what a magistrate judge did on August 28. (R. 492–93). Because of that order, an ALJ reheard the case on December 15, 2015. A vocational expert (VE) joined Smith in testifying. On March 9, 2016, the ALJ entered another unfavorable decision. The Appeals Council once again refused to exercise jurisdiction. But it granted Smith leave

to file her second civil action. (R. 387–392.) On May 21, 2016, Smith sought review of the denial of benefits in this Court. (Dkt. 1.)

## STANDARD OF REVIEW

Because the Appeals Council denied review, this Court must evaluate the ALJ's decision as the final say of the Acting Commissioner. *See Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018) (citing *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014)). In reviewing the Acting Commissioner's findings, a court asks whether substantial evidence supported the ALJ's conclusions. *See* 42 U.S.C. § 405(g); *Chavez v. Berryhill*, 895 F.3d 962, 967–68 (7th Cir. 2018). This is a question of law. *See Davenport v. Berryhill*, 721 F. App'x 524, 527 (7th Cir. 2018) (citations omitted).

The substantial evidence standard requires more than "a mere scintilla" of proof; instead, it demands "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ must examine the evidence both for and against the claimant, *see Brinley v. Berryhill*, 732 F. App'x 461, 465 (7th Cir. 2018), and "build an accurate and logical bridge from the evidence to her conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (citations omitted). Moreover, an ALJ may not ignore evidence that undermines her conclusion. *See id.* (citing *Scrogham*, 765 F.3d at 698).

The role of a reviewing court is not to reweigh evidence or substitute its judgment for the ALJ's. *See Walker v. Berryhill*, 900 F.3d 479, 483 (7th Cir. 2018). Deference, however, does not mean a "rubber stamp." *Brinley*, 732 F. App'x at 465. The

ALJ must explain how the evidence in the record supports her conclusion. *See id.* (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)).

## ANALYSIS

Smith's challenges are threefold. First, she contests the RFC determination and its underlying issues. Second, the adverse credibility finding. And third, the Step Five conclusion that she can perform work in the national economy. The Acting Commissioner, for her part, rejects these contentions because she believes that substantial evidence supports the ALJ's assessments.

The ALJ applied the familiar five-step analysis for evaluating disability, *see* 20 C.F.R. § 404.1520(a), and found that Smith was not disabled. (R. 405.) At step one, the ALJ determined that Smith had not engaged in substantial gainful activity since her alleged onset of disability in 2010. (R. 398.) At step two, the ALJ identified Smith's eye conditions—blepharospasm and dry eye syndrome—as "severe." (R. 398–400.) At step three, the ALJ decided that these impairments did not presumptively disable Smith. (R. 400.)

Step four and step five are the focus of Smith's lawsuit. At step four, the ALJ calculated Smith's RFC and found her able to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: she should not be required to drive a motorized vehicle as part of a job; she may occasionally read items with a size 12 font but rarely a size 8 font; she should not be required to read or handle objects of a smaller nature. The claimant has no limitations handling or working with larger objects and has no other exertional or nonexertional limitations.

(R. 401.) Smith takes issue with the font size limitation, however her main contention is that the ALJ did not consider all her ailments. In her analysis, the ALJ gave the treating doctor's statement "little weight" because it did not show any specific work-related functional limitations. (R. 403.) The ALJ further complained that Dr. Haag did not specify daily life limitations, report side effects from treatment, or cite examples and incidents regarding Smith's ability to work. (R. 403.) Relatedly, Smith asserts that the ALJ did not adequately expand on her credibility findings and that substantial evidence contradicts them anyway.

Finally, at step five, the ALJ considered Smith's age, education, work experience, and RFC, concluding that there is a significant number of jobs she could perform in the national economy. (R. 404–05.) Smith again presents her objection to the VE's sources for his figures, claims that the VE did not appreciate all her impairments collectively, and alleges that the ALJ failed to address her potential repeated and extended absences from work because of her eye conditions.

## I.     Residual Functional Capacity (RFC)

An RFC determination must account for the combined effects of all impairments including impairments that the ALJ considered not individually disabling. *See* 42 U.S.C. § 423(d)(2)(B); *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018). The SSA requires this. *See* 20 C.F.R. § 404.1545(a)(2) (stating that "[w]e will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe' . . . when we assess your residual functional capacity.").

The ALJ must follow a two-step process in considering a claimant's symptoms. (R. 401.) First, she must determine whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or symptoms. *See Nicholson v. Astrue*, 341 F. App'x 248, 251 (7th Cir. 2009). Second, once the claimant shows that, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. *See* 20 C.F.R. § 404.1529(c).

In Smith's case, the ALJ ignored the effects of at least four impairments beyond her issues with eyesight. The ALJ either entirely ignored or refused to consider the impact of Smith's spondylosis, asthma, depression, and arm pains (elbow and hand, to be specific), all orally presented at the hearing. Substantial evidence objectively verifies these conditions (R. 442–44, 453–54, 616, 624–25, 643, 653–54, 664–66, 673–75, 680–81), not to mention the evidence in the written record of irritable bowel syndrome ("IBS") and gastroesophageal reflux disease ("GERD" or acid reflux), although nobody verbally addressed those in the hearing. (R. 615, 617, 662, 665, 667–68). Smith put on this evidence of her health, so the ALJ should have considered it.

The ALJ's explanation that she "has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" (R. 401) is not enough. It was error for the ALJ to not follow the two-step process in considering the effects of Smith's other ailments. *See Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015). Even though the ALJ previously found that these impairments were not severe, she remained obligated to

consider their effects in her separate assessment of Smith's RFC. *See*
§ 404.1545(a)(2). Smith raised these conditions to the ALJ and produced medical ev-
idence to support the diagnoses, so they required consideration. *See Spicher*, 898
F.3d at 759. Moreover, the ALJ precluded herself from review of the combined effects
of Smith's impairments by not considering the effects of many in the first place. This,
too, was error. *See* § 423(d)(2)(B).

## II.     Treating Doctor's Opinion

A treating doctor's opinion controls unless it is unsupported by the record. *See*
*Britt*, 889 F.3d at 426 (citations omitted). Treating doctors are "familiar with a claim-
ant's medical issues over time and can provide a unique perspective." *Retzloff v. Col-*
*vin*, 673 F. App'x 561, 567 (7th Cir. 2016) (citation omitted). To that end, "[a]n ALJ
may not reject such an opinion without 'good reasons.'" *Id.* (citing 20 C.F.R.
§ 404.1527(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010)).

In Smith's case, the ALJ did not have "good reasons" to rebuke Dr. Haag. If
she was unable to discern the basis for his determination, then "the proper course
would have been to solicit additional information" from Dr. Haag. *Moore v. Colvin*,
743 F.3d 1118, 1127 (7th Cir. 2014) (citing *Simila v. Astrue*, 573 F.3d 503, 516–17
(7th Cir. 2009) (ALJ has a duty to solicit additional information where the medical
support is not readily discernible); *Scott v. Astrue*, 647 F.3d at 741 (7th Cir. 2011)).
The ALJ should have followed up with Dr. Haag and asked him to specify or clarify
his opinion if she thought it insufficient.

For instance, the ALJ faulted Dr. Haag because he did not report that she experienced any side effects from the Botox treatment for her eye conditions. (R. 403 (citing Exhibit 13F page 2).) Setting the veracity of that statement aside, *cf. Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009), if the ALJ could not readily discern medical support for Dr. Haag's view, she should have contacted him for further information. *See Simila*, 573 F.3d at 516. So, too, with Smith's daily life limitations, although there is a significant difference between those activities and a full-time job. *See Ghiselli v. Colvin*, 837 F.3d 771, 777–78 (7th Cir. 2016).

Even if there were sound reasons for the ALJ to refuse to give Dr. Haag's evaluation controlling weight, she was still obligated to determine what value it did have. *See* 20 C.F.R. § 404.1527(d)(2). The regulations required her to go on and "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the type of tests performed, and the consistency and supportability of the physician's opinion." *Scott*, 647 F.3d at 740 (citing § 404.1527(d)(2)). Here, many of these factors favor crediting Dr. Haag's assessment: Dr. Haag is a neuro-ophthalmologist; he saw Smith at least four times a year; and the treatment relationship, at the time, was going on six years. (R. 606.) The ALJ referenced some of these considerations in passing in her decision, however it does not appear that she seriously analyzed their relevance to the merit of Dr. Haag's opinion. (R. 403.) The inadequate evaluation of a treating doctor's assessment requires remand. *See Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018) (citation

omitted); *Kaminski v. Berryhill*, 894 F.3d 870, 875 (7th Cir. 2018), *amended on reh'g* (Aug. 30, 2018).

## III. Credibility

A reviewing court must overrule an ALJ's adverse credibility finding if it is patently wrong. *See Gerstner v. Berryhill*, 879 F.3d 257, 263 (7th Cir. 2018) (citing *Larson v. Astrue*, 615 F.3d 744, 745 (7th Cir. 2010)); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). An ALJ must support her credibility assessment with substantial evidence. In other words, "credibility findings should be express and reasoned . . ." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678 (7th Cir. 2010) (citations omitted). This means that an ALJ must explain herself and any purported inconsistencies in the record, not resort to "meaningless boilerplate." *Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018) (quoting *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016)).

Here, the ALJ relied on familiar boilerplate, stating that Smith's "testimony and allegations was *not entirely credible* and supported by evidence." (R. 402) (emphasis added); *Plessinger*, 900 F.3d 916 (criticizing this exact language). Next, the ALJ asserted that "some of the claimant's allegations were not supported" (*id.*), without specifically identifying those allegations. She went on to say that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . ." (*Id.*) The Seventh Circuit particularly rejects the use of that phrase, *Gerstner*, 879 F.3d at 263, amongst others. *Cf. Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018) (citations omitted).

In her decision, the ALJ identified four inconsistencies in Smith's story: (1) "[t]he claimant's statements regarding the efficacy of the injections are inconsistent with statements she made to physicians," (R. 402); (2) "[t]he undersigned notes that treatment record show that the claimant reported using the Restasis drops in the morning only which contradicts her testimony regarding the frequency of the use of the drops," (R. 402); (3) "[m]oreover, the evidence does not show that she informed Dr. Haig that she was using the nighttime gel during the day," (R. 402); and (4) "[s]he further testified that because she has to wake up in the middle of the night to use the gel, she is fatigued because of her interrupted sleep. Again, these complaints were not voiced to Dr. Haag." (R. 402).

Substantial evidence proves otherwise. First, Smith's statements in the hearing regarding the effectiveness of the injections are entirely consistent with the medical records. As the ALJ noted, the treatment notes show "variable efficacy and duration from the injections of approximately 2.5 months with 70 to 95 % relief." (R. 402 (citing Exhibit 12F).) Smith told the ALJ this during the hearing. (R. 424–26.) Second, the treatment notes show that, although Dr. Haag sometimes prescribed Restasis drops for morning use only (R. 219, 224, 371, 375), there were other times the doctor advised Smith to apply the drops "BID OU," or twice daily in both eyes. (R. 204, 220, 225, 227, 370, 372, 374, 376, 378, 386). The records indicate even more intermittent use—often at night. (R. 206–07, 227, 370, 376, 378.) Third, contrary to the ALJ's interpretation, the evidence shows that Smith informed Dr. Haag that she occasionally used the nighttime gel during the day; indeed, up to four or five times.

(R. 368, 373, 604.) Moreover, Dr. Haag prescribed it to her to use "when necessary." (R. 591, 592–93, 596.) Fourth, and finally, Smith complained to Dr. Haag and other physicians that the nighttime gel interrupted her sleep causing fatigue. (R. 597, 673, 677–78.) The ALJ's unsupported and unexplained credibility determination is reason enough to remand. *See Plessinger*, 900 F.3d at 916; *Stark*, 813 F.3d at 688.

## IV.   Step Five

Substantial evidence must support a conclusion that there are significant numbers of jobs in the economy suitable for a claimant to perform. *See Chavez v. Berryhill*, 895 F.3d 962, 967 (7th Cir. 2018). To investigate this, the ALJ sought the assistance of a vocational expert (VE). *See id.* at 964 (citing 20 C.F.R. § 416.966(e) (authorizing use of a VE and other specialists to aid with step five assessments)). VEs are well-educated and experienced in the field of job placement. *See id.* Their job is to testify objectively and impartially about the exertional requirements of various jobs and their frequency in the national economy. *See id.* (citation omitted). As to the exertional requirements of jobs, hypothetical questions posed to the VE must include all the claimant's impairments, to the extent they find support in the record. *See Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018) (citation omitted). And, as far as the frequency of jobs in the economy goes, the ALJ must "ensure that the approximation is the product of a reliable method." *Id.* at 968 (citations omitted).

**A. Hypothetical Questions**

Smith starts by contending that the ALJ failed to present the VE with all her impairments in combination. As stated previously, *see supra* Section I at 9–11, the ALJ failed to consider many impairments both individually and collectively in her determination of Smith's RFC. By later basing her hypotheticals on the RFC, the ALJ made the same mistake in her questioning of the VE. *Cf. Lanigan v. Berryhill*, 865 F.3d 558, 565–66 (7th Cir. 2017) (citing *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004) ("For all of the same reasons that the RFC fell short, the hypothetical question, which was based entirely on that RFC[,] did as well.")).

As to failing to address extended absences from work in both the hearing and her decision, the ALJ also erred. The ALJ may not cherry-pick evidence in this way. *See Kaminski v. Berryhill*, 894 F.3d 870, 874–75 (7th Cir. 2018), *amended on reh'g* (Aug. 30, 2018)*; Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018). To qualify for gainful employment, one must be able to work on a "sustained basis," which the SSA defines as eight hours a day for five days a week. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). Missing more time than allotted can preclude employment, and that can be as little as three or four work days a month. *See Childress v. Colvin*, 845 F.3d 789, 793 (7th Cir. 2017); *Voigt v. Colvin*, 781 F.3d 871, 874 (7th Cir. 2015).

The questions posed to the VE here did not address the five weeks out of every twelve that Smith cannot function. (R. 446.) Indeed, neither did those questions address the five minutes out of every twenty it takes for Smith to administer her eye drops. (R. 448.) The ALJ never explained these omissions in her decision and why

she believed they did not apply to Smith.  Specifically, the ALJ should have at least considered the likelihood of missing work in her RFC determination and hypothetical questioning, *see Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014), especially when the VE testified that Smith's limitations would "eliminate competitive employment." (R. 463; 462, 464.)  Instead, these determinations are missing, and the record does not support that result.

## B.     Sources for Job Numbers

A VE must use a reliable method to estimate job numbers.  In other words, it "must be supported by evidence sufficient to provide some modicum of confidence in its reliability." *Chavez v. Berryhill*, 895 F.3d 962, 969 (7th Cir. 2018).  To establish this confidence in estimates, the VE can "draw on his past experience [. . .], knowledge of national or local job markets, or practical learning from assisting people with locating jobs throughout the region, to offer an informed view on the reasonableness of his estimates." *Id.*  If questioned at the hearing, the VE must affirmatively explain, followed by an inquiry from the ALJ.  *See id.* at 969–70.  To be sure, inquiry does not mean just asking questions; rather, the ALJ must "hold the VE to account for the reliability of his job-number estimates." *Id.* at 970.  For without that, there will be "no evidentiary foundation on which the ALJ could rest a finding of credibility." *Id.*

Here, the ALJ overruled Smith's attorney's objection to the VE's source for job numbers without conducting the necessary inquiry first.  (R. 464–68.)  The ALJ should have required "the VE to offer a reasoned and principled explanation.  At or after a hearing, the VE could support the approximation by, for example, drawing on

knowledge of labor market conditions and occupational trends, gleaned from reviewing relevant data sources or from placing workers in jobs." *Chavez*, 895 F.3d at 970. Instead, the ALJ just accepted the estimates, even though the SSA does not consider the VE's source—Job Browser Pro—to be an authoritative publication. *See* 20 C.F.R. § 416.966(d). This is contrary to what the ALJ asserted in her decision. (R. 405.) Although the Dictionary of Occupational Titles ("DOT") has its own problems, *cf. Chavez*, 895 F.3d at 965; *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018), the SSA still considers it to be an authoritative publication. *See* § 416.966(d). The ALJ should not have been so quick to count Job Browser Pro against the DOT and the VE's expertise, save delving deeper in the first place. That choice leaves the Court with little confidence that Smith could perform the jobs that the ALJ identified. (R. 405.)

## CONCLUSION

Substantial evidence does not support the ALJ's conclusions. Accordingly, the Court grants Smith's motion, denies the acting Commissioner's motion, vacates the Acting Commissioner's judgment, and remands the case to the SSA for further proceedings consistent with this opinion.


_____
Virginia M. Kendall
United States District Judge

Date: September 28, 2018